## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ESPLANADE HL, LLC, *et al.* | ) | Case No. 16-33008 |
|  | ) | (Joint Administration Requested) |
|  | ) |  |
| Debtors.[1] | ) | Honorable Carol A. Doyle |
|  | ) |  |

## DECLARATION OF WILLIAM VANDER VELDE, III
## IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS

I, William Vander Velde III ("*Vander Velde*"), hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.	I am the sole managing member of Esplanade HL, LLC ("*EHL*"), 2380 Esplanade LLC ("*Esplanade*"), 9501 W. 144th Place LLC ("*9501*"), 171 W Belvidere, LLC ("*Belvidere*"), and Big Rock Ranch LLC ("*Big Rock*," and collectively with EHL, Esplanade, 9501, and Belvidere, the "*Debtors*").

2.	I have been the sole managing member of each of the Debtors since 2010 and I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

3.	On the date hereof (the "*Petition Date*"), each of the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Northern District of Illinois (the "*Court*"). As shall be set forth below, a receiver was appointed for certain of the Debtors. The Debtors desire to retain possession of their properties and manage their businesses as debtors-in-possession in accordance with sections 1107 and 1108

---

[1]	The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Esplanade HL, LLC (6804); (ii) 2380 Esplanade Drive, LLC (0331); (iii) 171 W. Belvidere Road, LLC (2032); (iv) 9501 W. 144th Place, LLC (7104); (v) Big Rock Ranch, LLC (7248).

of the Bankruptcy Code.  In order to enable the Debtors to minimize the adverse effects of the chapter 11 filing, the Debtors are requesting various types of relief in "first day" motions and applications (collectively, the "*First Day Motions*") that are being filed with the Court.

4.      I am submitting this declaration (the "*Declaration*") in support of the Debtors' chapter 11 petitions and First Day Motions in the above-captioned cases.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my review of public and nonpublic documents, or my opinion, based on my experience and knowledge of the real estate industry and the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the statements set forth herein.

5.      Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the commencement of these chapter 11 cases.  In Part II of this Declaration, I substantiate the truth and accuracy of the relevant facts set forth in the First Day Motions filed concurrently herewith.

## I.  BACKGROUND

### A.  Acquisition of Real Estate, Construction Financing and Prepetition Debt

6.      The Debtors own certain real estate consisting of:

A.      Lots 12, 13 and 14 (collectively, the "*EHL Property*") within the Esplanade Subdivision ("*ES*") in Algonquin, Illinois containing a Hobby Store, now known as Lots 1 and 2 of the final re-subdivision of the ES;

B.      Lot 6 (the "*Esplanade Building*") located at 2380 Esplanade, Algonquin, Illinois and Units 100 and 300 in the three story business condominium building located on Lot 7 located at 2390 Esplanade, Algonquin, Illinois (collectively, the "*Condo Units*" and collectively with the Esplanade Building, the "*Esplanade Property*");

C.      An office building (the "*9501 Property*") located at 9501 W. 144th Orland Park, Illinois;

D.      A strip mall shopping center (the "*Belvidere Property*") located at 171 W Belvidere in Round Lake, Illinois; and

E.      A ranch located at 310 Thick Spike Road, Fairplay, Colorado (the "*Big Rock Property*")

A true and correct copy of the Final Plat of Subdivision of ES is attached hereto as <u>Exhibits A-1</u> (clean copy) and <u>A-2</u> (marked to show the EHL Property and the Esplanade Property) the Re-subdivision is attached hereto as <u>Exhibit B</u>.[2]

7.     Prior to the appointment of the receiver, my wife and I managed each of the Debtors' properties.

8.     Upon information and belief, on January 27, 2010, after Esplanade Partners LLC (the "*Original Developer*") defaulted on its loan from First Midwest Bank ("*FMB*"), the Original Developer transferred twelve of the fifteen lots of the ES to FMB.  The ES is located on Randall Road in a high traffic commercial area that features a Hobby Lobby, Best Buy, Walmart, Dick's Sporting Goods, and Trader Joe's.

9.     Upon information and belief, on February 23, 2010, FMB transferred its ES lots (along with the duties and obligations of the Original Developer) to Synergy Property Holdings, LLC ("*Synergy*" and collectively with FMB, the "*Successor Developer*"), a wholly owned affiliate or subsidiary of FMB. Synergy's employees were also FMB employees and references to FMB shall be deemed to include Synergy to the extent applicable as the parties used them interchangeably.

10.     I purchased the 9501 Property for $2,000,000 (the "*9501 Purchase Price*") pursuant to terms of that certain Real Estate Purchase and Sale Agreement (the "*9501 Purchase Agreement*") dated March 15, 2010 by and between 9501 and First Midwest Bank as Trustee under Trust Agreement dated August 3, 1993 and known as Trust No. 5712.

---

[2]     The various transaction documents refer to the EHL Property as Lots 12, 13 and 14 based on the Final Plat. As set forth on Exhibit B, In 2014, the ES property was re-subdivided and on the re-subdivided plat, Lots 12, 13 and 14 are described as Lots 1 and 2, notwithstanding the fact that the re-subdivided plat has two other lots labeled "Lot 1" and two lots labeled "Lot 2."

11.     The 9501 Purchase Agreement closed on March 29, 2010 and the 9501 Purchase Price was paid as follows:

A.     $300,000 cash; and

B.     $1,700,000 from the proceeds of that certain Term Note (as amended from time to time thereafter, the "*9501 Term Note*") dated March 29, 2010, executed by 9501 in favor of FMB in the original principal amount of $1,700,000.  The outstanding principal balance of the 9501 Term Note as of the Petition Date was approximately $1,552,479.11 plus accrued interest, fees, and costs (the "*Prepetition 9501 Term Note Debt*").  9501 also executed that certain Line of Credit Note (as amended from time to time thereafter, the "*9501 LOC Note*") in favor of FMB dated March 29, 2010 in the original principal amount of $350,000.  The outstanding principal balance of the 9501 LOC Note as of the Petition Date was approximately $349,406.87 plus accrued interest, fees, and costs (the "*Prepetition 9501 LOC Debt*," and collectively with the Prepetition 9501 Term Note Debt, the "*Prepetition 9501 Debt*").  The Prepetition 9501 Debt is secured by (a) that certain Mortgage, Fixture Filing and Security Agreement with Assignment of Rents dated March 29, 2010 by and between 9501 and FMB related to the 9501 Property and (b) that certain Assignment of Leases and Rents dated March 29, 2010 by and between 9501 and FMB.

12.     I purchased the Belvidere Property for $1,025,000 (the "*Belvidere Purchase Price*") cash pursuant to terms of that certain Real Estate Purchase and Sale Agreement (the "*Belvidere Purchase Agreement*") by and between Synergy Property Holdings, LLC and Belvidere dated March 31, 2010.

13.     EHL purchased Lots 13 and 14 of the EHL Property and the Esplanade Property for the aggregate amount of $2,500,000 ("*EHL Purchase Price*") pursuant to the terms of that

4

certain Purchase and Sale Agreement (the "*EHL Purchase Agreement*") dated September 24, 2010 by and between Esplanade and Synergy.   The EHL Purchase Agreement closed on December 31, 2010 and, at closing, Synergy executed a Warranty Deed transferring the EHL Property to EHL.   The EHL Purchase Price was paid as follows:

A.   $75,000 cash;

B.   $425,000 from the proceeds of that certain Promissory Note (as amended from time to time thereafter, the "*2010 Belvidere Note*") dated December 30, 2010, executed by Belvidere and me, jointly and severally, in favor of FMB in the original principal amount of $425,000, which principal amount was subsequently increased to $675,000 through a series of amendments.   The outstanding principal balance of the 2010 Belvidere Note as of the Petition Date was approximately $588,013.36 plus accrued interest, fees, and costs (the "*Prepetition 2010 Belvidere Debt*").   The 2010 Belvidere Note is secured by (a) that certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated December 30, 2010 by and between Belvidere and FMB related to the Belvidere Property; and (b) that certain Assignment of Leases and Rents dated December 30, 2010 by and between Belvidere and FMB; and

C.   $2,000,000 from the proceeds of that certain Promissory Note (as amended from time to time thereafter, the "*Esplanade Note*") dated December 30, 2010, executed by EHL[3] and Esplanade in favor of FMB in the original principal amount of $2,000,000.   The outstanding principal balance of the Esplanade Note as of the Petition Date was approximately $1,012,979.50 plus accrued interest, fees, and costs (the "*Prepetition Esplanade Note Debt*").   The Esplanade Note is secured by (a) that certain Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated December 30, 2010 by and between

---

[3]      EHL was released from the Esplanade Note pursuant to that certain *Second Amendment to Loan Documents* dated as of December 31, 2011.

Esplanade and FMB related to Esplanade Property and (b) that certain Assignment of Leases and Rents dated March 29, 2010 by and between Esplanade and FMB.

14.     On or about December 13, 2010, Successor Developer and I obtained a change in the zoning from the Village of Algonquin (the "*Village*") for Lots 12, 13 and 14 of the ES to commercial from industrial.  This change was necessary because EHL's intention for purchasing the EHL Property was to enter into a lease with Hobby Lobby Stores, Inc. ("*Hobby Lobby*"). Without the zoning change, EHL could not enter into the Hobby Lobby lease.  I, along with representatives of the Successor Developer, attended numerous zoning meetings related to the zoning change.

15.     When Successor Developer took title to the ES, no condominium association had been formed to manage the ES, despite the existence of certain declarations and covenants requiring such an association.  At the 2010 zoning hearings attended by Successor Developer, the Village informed Successor Developer that the declarations recorded in 2005 were no longer applicable and new declarations were necessary to reflect the changed character of the development.  The Village further advised that because Successor Developer (FMB) stepped into the shoes of the Original Developer, it was responsible for completing the new Declarations and that the formation of a condominium association was critical to the Village's approval of future construction in the ES.

16.     Simultaneously with the closing of the EHL Purchase Agreement, EHL entered into that certain lease (the "*Hobby Lobby Lease*") dated December 30, 2010 with Hobby Lobby that provided for the construction of a Hobby Lobby retail store and the lease for such store on the EHL Property.

17.     The construction of the Hobby Lobby store was financed primarily with the proceeds of that certain Promissory Note (as amended from time to time thereafter, the "*EHL Note*") dated April 27, 2011, executed by EHL in favor of FMB in the original principal amount of $3,500,000, which was subsequently increased to (i) $3,600,000 pursuant to the First Amendment dated September 30, 2011 and (ii) $3,950,000 pursuant to the Second Amendment dated June 29, 2012.  The outstanding principal balance of the EHL Note as of the Petition Date was approximately $3,931,566.89 plus accrued interest, fees, and costs (collectively, the "*Prepetition EHL Debt*").   The EHL Note is secured by (a) that certain (i) Construction Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated April 27, 2011 (the "*EHL Mortgage*") related to Lots 13 and 14 of the EHL Property and (ii) First Amendment to Loan Documents dated September 30, 2011 related to Lot 12; and (b) that certain Assignment of Leases and Rents dated April 27, 2011.  The EHL Note was also governed by the terms of that certain Construction Loan Agreement dated April 27, 2011 by and between EHL and FMB, which provided that construction of the Hobby Lobby store was financed by the proceeds of the EHL Note (75%) and my equity contributions (25%).  The original budget was $5.3 million, however, for reasons set forth below, the actual construction costs were approximately $6.3 million.

18.     I financed my equity contribution as follows:

A.     $300,000 cash;

B.     $80,000 from the proceeds of the 9501 LOC Note;

C.     $150,000 from the increase in the principal amount of the 2010 Belvidere Note;

D.      $430,000 from the proceeds of that certain Promissory Note (as amended from time to time thereafter, the "*2012 Belvidere Note*") dated February 15, 2012, executed by Belvedere and myself, jointly and severally, in favor of FMB in the original principal amount of $350,000, which principal amount was subsequently increased to $430,000 through a series of amendments.   The outstanding principal balance of the 2012 Belvidere Note as of the Petition Date was approximately $445,577.79 plus accrued interest, fees, and costs (the "*Prepetition 2012 Belvidere Note*" and collectively, with the Prepetition 2010 Belvidere Debt, the "*Prepetition Belvidere Debt*"). The 2012 Belvidere Note is secured by (a) that certain Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated February 15, 2012 by and between Belvidere and FMB related to the Belvidere Property and (b) that certain Assignment of Leases and Rents dated February 15, 2012 by and between Belvidere and FMB; and

E.      $662,500 from the proceeds of that certain Promissory Note (as amended from time to time thereafter, the "*Big Rock Note*") dated August 22, 2012, executed by Big Rock[4] and myself, jointly and severally, executed in favor of FMB in the original principal amount of $662,500.   The outstanding principal balance of the Big Rock Note as of the Petition Date was approximately $461.831.25 plus accrued interest, fees, and costs (the "*Prepetition Big Rock Debt*") and the Prepetition Big Rock Debt is secured by (a) that certain Deed of Trust dated August 22, 2012 by and between Big Rock and FMB related to the Big Rock Property and (b) that certain Assignment of Rents dated August 22, 2012 by and between Big Rock and FMB.

---

[4]      Big Rock is a ranch in Colorado.

19.   In summary, the Hobby Lobby construction costs were funded as follows:

| Funding Source | Description | Amount |
|---|---|---|
| FMB | EHL Note | $3,900,000 |
| FMB | 9501 LOC Note | 80,000 |
| FMB | 2010 Belvidere Note | 150,000 |
| FMB | 2012 Belvidere Note | 430,000 |
| FMB | Big Rock Note | 460,500 |
| Vander Velde | Cash | 300,000 |
| | | |
| Total | | $5,320,500 |

## B.   Events Leading to the Chapter 11 Filing

### a.   Lots 8 and 12

20.   The legal description attached as Exhibit A-3 to the EHL Purchase Agreement indicated that EHL purchased Lots M & H of the ES and Exhibit A to the Hobby Lobby Lease indicated that Hobby Lobby leased Lots 13 and 14 of the ES.[5]  EHL, pursuant to the plans and specifications attached to the Hobby Lobby Lease and reviewed by FMB during the approval of EHL's acquisition financing and again during FMB's approval of the construction financing, built the Hobby Lobby parking lot on Lot 12.  I believed that Lot 12 had been included in both the EHL Purchase Agreement and the Hobby Lobby Lease and subsequently discovered that it was not.  In or about September 2011, EHL approached Synergy about amending Exhibit A to the EHL Purchase Agreement.  Synergy refused and instead required EHL to purchase Lot 12 for $280,000 and also agreed to transfer Lot 8 to Esplanade.  EHL had no choice but to purchase Lot 12.  The purchase of Lots 8 and 12 closed on September 30, 2011.  EHL and Esplanade paid for Lots 8 and 12 with the proceeds of a $250,000 draw (which should have been available to pay for the construction of the Hobby Lobby Store) on the EHL Note and $30,000 of cash from me

---

[5]     The Debtors are uncertain why the EHL Purchase Agreement identified the lots by letters as opposed to numbers.  Lots M and H are identical to Lots 13 and 14.

personally.  Lot 12 was pledged as additional security for the EHL Note and Lot 8 was pledged as additional security for the Esplanade Note.

**b.      Unanticipated Improvement Costs**

21.      While construction of the Hobby Lobby store was proceeding in 2011, the Village informed Synergy and EHL that it would not issue the necessary permits to enable the Hobby Lobby store to open unless certain improvements were made to the ES on lots owned by Synergy or other third parties.  Synergy (FMB), as the Successor Developer and owner of the majority of the ES, was responsible for making the improvements.

22.      Synergy refused to commit to making the improvements and, on November 30, 2011, as construction was progressing on the Hobby Lobby store, I met with Successor Developer to talk about the status of the improvements.

23.      It was critical that EHL complete the construction of the Hobby Lobby on time in order to pay the EHL Note on or before the maturity date of June 29, 2012.  Synergy refused to commit to being solely responsible for making the required improvements, despite the fact that it was its legal responsibility, as the Successor Developer and owner of the vast majority of the ES, to make such improvements.

24.      I was very concerned that the Successor Developer's lack of action would cause me to default on the EHL Note.  Faced with a pending enormous financial loss, both for EHL and for me personally, as I guaranteed, or was co-borrower on, each of the FMB loans, I had no other choice but to negotiate with Successor Developer (or litigate against a defendant that would have substantially more resources than I would).  Following our November 30, 2011 meeting, the Successor Developer and I, on behalf of EHL, reached a compromise (the "*Compromise*")

regarding a division of the improvements between Successor Developer and EHL, as documented on the emails attached hereto as Exhibit C.

25.     A summary of the improvements (collectively, the "*Improvements*") required by the Village are listed in the "task" column on the following chart:

| Task No. | Task | Initial Responsible Party | EHL Cost | Plat Area (See Exhibit D) |
|---|---|---|---|---|
| 1 | Repair Retention pond | Both | $56,000 (including a deposit to maintain the pond required by the Village on account of the lack of a condominium association | East Lot 9 |
| 2 | Repair Monument Sign | Both | $1,000 | East Lot 9 |
| 3 | Plant Seeding | Both | $5,000 | Lots 9-11 |
| 4 | Plant Top soil | EHL | $12,500 | Lots 9-11 |
| 5 | Complete Sidewalk | EHL | $4,000 | Lots 9-11 |
| 6 | Fill in Potholes | EHL | $5,000 | Between numerous lots |
| 7 | Mange the ES Condominium Association | EHL | N/A | N/A |
| 8 | Install Street light | Successor Developer | $88,500 | North of Lot 5 |
| 9 | Move Street light box | Successor Developer | See (8) above | North of Lot 9 |
| 10 | Set up ES Condominium Association | Successor Developer | none | N/A |
| 11 | Repair Missing Concrete | Successor Developer | $4,500 | North of Lot 5 |
| TOTAL | | | $176,500 | |

26.     At the time of the Compromise (and as far back as 2010), Successor Developer (FMB) understood that a condition precedent to the formation of the ES condominium association was Successor Developer's completion of revised Declarations (as defined below) to govern the entire ES.   The Successor Developer's failure to timely prepare the Declarations severely hindered my ability to (i) negotiate the Hobby Lobby lease and resulted in Hobby Lobby not being assessed its full *pro rata* share of the common area maintenance expenses and (ii) amend the Hobby Lobby Lease to modify the property description, which would have allowed EHL to sell the Outlot (as defined herein).

27.     Successor Developer did not make any of the Improvements that it agreed to complete pursuant to the Compromise, except Task No. 7, which it did not do until April, 2015. Instead, in order to allow the completion and opening of the Hobby Lobby, EHL was forced to make all of the Improvements. Successor Developer then refused to reimburse EHL for the costs that EHL incurred to complete the Improvements that Successor Developer had agreed to undertake pursuant to the Compromise, in breach of the Compromise.   EHL incurred $176,500 in unbudgeted expenses because of Successor Developer's refusal to perform the Improvements and timely establish the condominium association.

28.     To be clear, Successor Developer forced me to make all the Improvements despite the fact that neither EHL nor I had any legal responsibility to make such Improvements and NONE of the Improvements were made on lots owned by EHL or Esplanade.   Further (i) Tasks Nos 8, 9 and 11 all related to real estate that does not abut the EHL Property or Esplanade Property and (ii) the vast majority of the Improvements were on real estate owned by Synergy.   I only agreed to complete the Improvements to avoid litigation with FMB, to timely open the Hobby Lobby store and because I was concerned about losing my entire investment in

not only EHL but also my other properties.  Because EHL made the Improvements necessary to

obtain the permits from the Village, the Hobby Lobby store opened in August 2012.[6]

29.     The one Improvement that was most troublesome to EHL was the formation of

the condominium association, as this was the one task that EHL could not perform on behalf of

Successor Developer.  The formation of the condominium association was critical because the

Village required the creation of this entity to manage the ES, determine common area

maintenance costs, maintain common areas in accordance with the Village's requirements, and

enforce the association bylaws. Successor Developer did not form the Esplanade Subdivision

Owners Association (the "*Esplanade Association*") until sometime around or after April 2015.

This delay caused substantial hardship to me and each of the Debtors.

30.     Unfortunately, the Improvements were not the only cost overruns. Total overruns

of approximately $978,000 (the "*Cost Overruns*") were as follows:

| Description of Overrun | Amount of Overrun | Explanation |
|---|---|---|
| Purchase of Lot 12 | $280,000 | See ¶20 |
| Improvements | $176,500 | See ¶25 |
| Install Caissons | $270,000 | Initial plans did not contemplate installation of caissons surrounding the Hobby Lobby Store |
| Hobby Lobby Change orders | $86,000 | Hobby Lobby failed to reimburse ESL for requested change orders |
| Other | $165,500 | |
| **Total** | $978,000 | |

31.     EHL and Hobby Lobby had reached an agreement to re-subdivide plats 12, 13,

and 14 into plats 1 and 2 in order to create an "outlot' (the "*Outlot*") that EHL could sell in order

to recover a portion of the costs of the caissons.  While the amendment to the Hobby Lobby

---

[6]     On June 29, 2012, FMB extended the maturity date of the EHL Note to September 30, 2012.

Lease was being prepared, EHL began marketing the Outlot.  In 2014, EHL located a buyer

willing to purchase the Outlot for $180,000.   For reasons set forth below, the sale did not close.

32.     EHL intended to fund an additional portion of the Cost Overruns with the

proceeds of the sale of Lot 8 (approximately $300,000) in 2014 and the sale of the EHL

Property.  Instead, FMB required that the Lot 8 proceeds be applied to the Esplanade Note.  As a

result, EHL was unable to pay the Cost Overruns, resulting in numerous mechanic lien claims

(see below).  EHL was aware that, because of the Cost Overruns, it needed to sell the EHL

Property as soon as possible in order to pay its outstanding obligations to the mechanic lien

claimants and FMB.  EHL advised FMB on multiple occasions of the need for an imminent sale

of the EHL Property to avoid default on the EHL Note and avoid additional interest and attorney

fees on the mechanic liens. Because (i) Successor Developer did not timely prepare and complete

the Esplanade Subdivision Declaration of Easements and Restrictions (the "*Declarations*") and

(ii) the Esplanade Association was not timely formed, EHL was unable to deliver marketable

title and, therefore, was prevented from closing on the multiple contracts described below for the

sale of the EHL Property. The Declarations, attached hereto as Exhibit E, were not recorded until

April 10, 2015.

33.     In fact, as set forth above, the Declarations were a condition precedent to forming

the association and should have been done in early 2011.  I repeatedly requested updates as to the

status of the Declarations and at various times was told (i) "soon," (ii) that an attorney was hired

to complete the Declarations, (iii) that a new attorney had replaced the original attorney to

complete the Declarations, and (iv) that the original attorney had replaced the new attorney to

complete the Declarations.

34.     I was very concerned about the lack of progress on the Declarations because, in addition to the Village, EHL, Esplanade, and Successor Developer, five outside parties (and their lenders, if applicable) had to review and sign the Declarations before they could be recorded, which would require a long lead time as each owner would need to review such documents and/or obtain lender consents.   In fact, the entire process took over a year as Successor Developer did not re-retain the original attorney to complete the new Declarations until early March 2014, and the last party did not sign until March 31, 2015.

### c.     First Offer

35.     EHL was prepared to sell the EHL Property upon realizing it would have difficulty paying the Cost Overruns, even if Successor Developer had agreed to pay for the Improvements and Hobby Lobby paid for the change orders.   EHL received a Letter of Intent dated March 28, 2012 from a third party purchaser ("*First Buyer*") to purchase the EHL Property for $5,750,000.   The Letter of Intent was amended and restated  on October 31, 2012 to, among other things, increase the purchase price to $5,857,805 (collectively, the "*First Letter of Intent*"). This offer was very attractive because it would have allowed EHL to repay the EHL Note prior to the original maturity date of June 29, 2012, as well as the various mechanic lien claims and most of the Debtors' other obligations to FMB.   However, the parties were not able to reach agreement on a purchase agreement and First Buyer terminated the First Letter of Intent.

### d.     Mechanic Liens

36.     EHL was unable to pay the general contractor and numerous subcontractors in full because of the Cost Overruns, including those related to the purchase of Lots 8 and 12, the Improvements, FMB's refusal to allow EHL to use the Lot 8 sale proceeds to pay construction expenses and its inability to sell the Outlot.   Throughout 2012 and 2013, the general contractor

and various subcontractors filed liens against EHL Property for payment and, on December 20, 2013, O'Hare Mechanical Contractors, Inc. ("*OMC*") filed its complaint (the "*Mechanic Lien Complaint*") against EHL in the Circuit Court for the 16th Judicial District, Kane County, Illinois captioned as Case No. 2013 CH 2726. OMC also named seventeen other parties and the general contractor in the Mechanic Lien Complaint, all of whom claimed an interest in the EHL Property (collectively, along with OMC, the "*Mechanic Lien Claimants*").

37.     EHL was able to negotiate with the Mechanic Lien Claimants and was able to avoid foreclosure and a judgment while EHL attempted to negotiate a sale of the EHL Property. In fact, release documents had been prepared in anticipation of a sale of the EHL Property and, throughout 2014 and 2015, most of the Mechanic Lien Claimants were prepared to release their claims without the payment of attorney fees or interest. Unfortunately, as set forth below, Successor Developer's delay in completing and recording the Declarations and forming the Esplanade Association rendered the sale of the EHL Property impossible, since no buyer was willing to close without knowing the costs that it would be required to pay to the Esplanade Association for common area maintenance expenses.

**e.      Second Offer**

38.     In early 2014, First Buyer once again made an offer to purchase the EHL Property. On or about March 7, 2014, EHL and First Buyer entered into that certain Purchase and Sale Agreement whereby First Buyer agreed to purchase the EHL Property (the "*First Contract*") for $5,877,805.

39.     The First Contract was subject to EHL being able to deliver marketable title to First Buyer, which it could not do because Successor Developer had not formed the Esplanade Association and completed the Declarations and because of the mechanic lien issues. I informed

FMB of the First Contract and FMB promised that Successor Developer would timely complete the Declarations in order to allow the prompt closing of the First Contract.  It hired a new counsel to complete the Declaration.  This counsel did not timely complete the Declarations and Successor Developer went back to its original counsel, while continuing to promise that the Declarations would be done "soon."

40.     The maturity date of the EHL Note was extended three times in 2014 to allow for the closing contemplated by the First Contact to occur, which required completion of the Declarations and formation of the Esplanade Association. The First Contract was extended 13 times throughout 2014 awaiting the completion of the Declarations.  Successor Developer did not timely complete the Declarations and in late, 2014, First Buyer terminated the First Contract.

41.     EHL and I suffered substantial harm on account of the termination of the First Contract because, but for Successor Developer's failure to timely complete the Declarations and form the Esplanade Association, EHL would have sold the EHL Property, which would have enabled it to resolve the Mechanic Lien Complaint and the other mechanic liens clouding title to the property, and pay off the EHL Note as well as most of the Debtors' other obligations to FMB and would have prevented the receiver actions described below. Instead, the Mechanic Lien Claimants lost patience and proceeded with litigating the Mechanic Lien Complaint and the Debtors were unable to pay their obligations to FMB

42.     On March 26, 2015, counsel for EHL sent a letter (the "*Latus letter*") detailing the costs that EHL had incurred because of the delays in completing the Declarations. A true and correct copy of the Latus letter is attached hereto as <u>Exhibit F</u>.  FMB responded in a letter dated March 27, 2015 (the "*Smith Letter*") by confirming that it agreed to "assist" EHL in completing the Declarations, but shockingly denied it agreed to bear the cost of such Declarations,

notwithstanding the fact that it was the Successor Developer.  A true and correct copy of the Smith Letter is attached hereto as Exhibit G. In April 2015, the Declarations were finally recorded and the Esplanade Association formed.

43.     Once established, upon information and belief, three members of the Successor Developer were named as the three members of the Esplanade Association board. The board proceeded to hire a management company to operate the properties, including preparing a budget (the "*Budget*") so property owners would understand the allocation of common area maintenance and other expenses.  Unfortunately, the management company did not prepare the Budget or do anything else, for eight months.

**f.     Third Offer**

44.     On June 15, 2015, a second third party purchaser ("*Second Buyer*") executed a letter of intent to purchase the EHL Property (the "*Third Offer*").   On or about July 23, 2015, Second Buyer and EHL entered into that certain purchase agreement (the "*Second Contract*") whereby Second Buyer agreed to purchase the EHL Property for $6,325,000. Second Buyer required the Budget as a condition to close on the Second Contract. I advised Successor Developer that I had a buyer for the property, but that they required a completed association budget in order to close on the sale. The Esplanade Association, controlled by the Successor Developer (FMB), failed to deliver the Budget.  In addition, Second Buyer required that the Hobby Lobby lease be amended to reflect the proper property descriptions and square footage. Hobby Lobby, infuriated about being dragged into the Mechanic Lien Complaint litigation, refused to cooperate.  Hobby Lobby's refusal to amend the lease also resulted in EHL not being able to close on the Outlot offer, costing EHL $180,000.

45.     On September 30, 2015, Second Buyer terminated the Second Contract, once again damaging EHL by depriving it of being able to pay the EHL Note, the Mechanic Lien Claimants and certain other obligations owed to FMB.

**g.     Fourth Offer**

46.     In November 18, 2015, EHL entered into a third contract to sell the EHL Property when it and GELO Properties, LLC ("*Gelo*") entered into that certain purchase agreement (the "*Gelo Contract*") dated November 18, 2015 to purchase the EHL Property for $6,400,000. Not surprisingly, as part of its diligence, Gelo required certain information regarding costs associated with the EHL Property as part of its due diligence. EHL was able to provide Gelo with all of the required information except the Budget, because Successor Developer failed to provide same.

47.     In January 2016, I advised Successor Developer that I, again, needed the Budget immediately in order to close on the sale of the EHL Property, pay the mechanic liens and pay the Debtors' obligations to FMB.  I asked Successor Developer to replace the management company in charge of preparing the Budget, because the existing management company chosen by Successor Developer had not fulfilled its obligations.  Following my request, Successor Developer, through its agents on the Esplanade Association, agreed to hire a new management company.  In March, 2016, a Budget was finally prepared.  Gelo, however, was not satisfied with the Budget, alleging that based on its experience, the Budget was not accurate.

48.     Because the EHL Property had not been managed through an association until mid-2015 and there was no Budget, there was incomplete (and a lack of historical) information on costs associated with maintaining the EHL Property.  As a result, Gelo demanded a (i) significant reduction in its purchase price, to $6,200,000, and (ii) inclusion of the Outlot in the Third Contract, resulting in an aggregate reduction of $380,000 to EHL.  In addition, EHL was

unable to reach agreement with FMB regarding a final payoff amount, primarily because FMB refused to reduce the loan amount for the cost of the Improvements and the other delays it caused by failing to timely record the Declarations, form the Esplanade Association, and prepare the Budget.  A reduction of the loan amount would have enabled EHL to satisfy the claims of the Mechanic Lien Claimants and deliver marketable title to Gelo.  For the third time, Successor Developer's failure to timely complete the Declarations resulted in a lost opportunity to repay its obligations to FMB and the Mechanic Lien Claimants. The parties are currently in litigation with respect to the Gelo Contract, which litigation has been consolidated with the Mechanic Lien Complaint.

49.     In summary, Declarant's failure to (i) timely complete and record the Declarations, (ii) timely form the Esplanade Association, (iii) prepare the Budget, and (iv) permit the use of the Lot 8 sale proceeds to pay for the Improvements, along with the loss of the Outlot sale, caused substantial damages by eliminating EHL's ability to sell the EHL Property and repay its obligations to FMB.

**h.     Other Properties**

50.     9501 used a portion of the proceeds of the 9501 LOC for tenant repairs.  In 2012, FMB refused to allow further draws on the 9501 LOC (as well as draws on the Big Rock Note). As a result, 9501 could not complete its build out and therefore could not attract new tenants. 9501 delayed making payments on the 9501 Term Note, using the proceeds to complete the build out.  9501 is now at 85% capacity and is generating sufficient cash flow to pay its expenses and debt service.

51.     Belvidere is now at 85% capacity and is generating sufficient cash flow to pay its expenses and debt service.

52.     Esplanade is now at 60% capacity and is generating sufficient cash flow to pay its expenses and debt service.

**i.     Receiver Motions**

53.     On May 31, 2016, FMB filed a Verified Complaint to Foreclose Mortgages and Other Relief in the Circuit Court of the Nineteenth Judicial Circuit in Lake County, Illinois, against Belvidere and me, seeking, among other things, to foreclose the 2010 Mortgage and the 2012 Mortgage.  On July 15, 2016, FMB filed a Motion to Appoint Receiver (the "*Belvidere Receiver Motion*").  On August 24, 2016, the court granted the Belvidere Receiver Motion and appointed Matthew Brash as receiver over the Belvidere Property.

54.     On June 17, 2016, FMB filed a:

i.     Verified Counterclaim and Cross Claim to Foreclose Mortgage and Other Relief in the same case to foreclose its interest in the EHL Property.  On June 24, 2016, FMB filed its Motion to Appoint Receiver (the "*EHL Receiver Motion*").  On September 20, 2016, the EHL Receiver Motion was granted and Matthew Brash was appointed as receiver over the EHL Property.

ii.     Verified Complaint to Foreclose Mortgage and Other Relief against, Esplanade and myself, in the Circuit Court for the 16th Judicial District in Kane County, Illinois. On August 2, 2016, FMB filed a Motion to Appoint Receiver (the "*Esplanade Receiver Motion*").  On October 3, 2016, the court granted the Esplanade Receiver Motion and Matthew Brash was appointed as the receiver for the Esplanade Property.

iii.     Verified Complaint to Foreclose Mortgage and Other Relief against, among others, 9501 and me, in the Circuit Court of Cook County, Chancery Division.   On August 1, 2016, FMB filed its Motion to Appoint Receiver (the "*9501 Receiver Motion*").   On

October 4, 2016, the 9501 Receiver Motion was granted and Matthew Brash was appointed receiver the 9501 Property.

## C.   **Purpose of Chapter 11 Cases**

55.   The Debtors intend on using the chapter 11 process to regain control of their assets for the purpose of obtaining exit financing to repay FMB, the Mechanic Lien Claimants and their other creditors or, in the alternative, selling their assets.

## II.   FIRST DAY MOTIONS AND APPLICATION

56.   Concurrently with the filing of its Chapter 11 petition, the Debtors are filing certain applications, motions, and proposed orders.  The Debtors request that the relief described below be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtors for the benefit of all parties in interest.

57.   I have reviewed and discussed with Debtors' counsel each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference any factual statements set forth in the First Day Motions. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the goals of this Chapter 11 Case.

## A.   Motion to Direct Joint Administration of Related Chapter 11 Cases

58.   By the Joint Administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of the chapter 11 cases of each of the Debtors and the consolidation thereof only for procedural purposes pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"). In addition, the Debtors request that the Clerk of the Bankruptcy Court make an entry on the docket of EHL's case stating that an

order has been entered directing joint administration of these chapter 11 cases and that all further

pleadings and other papers shall be filed in and all further docket entries shall be made in the

EHL docket.

59.    The Debtors are related entities and are filing petitions in the same Bankruptcy

Court. I believe that joint administration will be less costly and burdensome than separate

procedural administration of the estates due to the combined docket and combined notice to

creditors and parties in interest.  Parties in interest will likely file many applications, motions,

orders, hearings, and notices in these cases that will affect all Debtors and their estates.  Joint

administration will keep all parties informed of matters related to these cases without the

inconvenience and confusion of reviewing separate dockets.  In addition, since the Debtors are

seeking only administrative consolidation by this motion, rather than substantive consolidation, I

do not believe creditors' interests will be impacted.

60.    I believe that if each Debtor's case was administered independently, there would

be a number of duplicative pleadings and overlapping service. This unnecessary duplication of

identical documents would be wasteful of the Debtors' resources, as well as other parties' and

this Bankruptcy Court's resources.

61.    Therefore, I believe that the chapter 11 cases should be jointly administered for

procedural purposes only, and the Joint Administration Motion should be approved.

**B.    Motion For Interim And Final Orders: (I) Authorizing Use of Cash Collateral; (II)
     Granting Adequate Protection; (III) Scheduling Final Hearing; and (IV) Granting
     Related Relief**

62.    The  Debtors are seeking entry of orders pursuant to sections 105, 361, 362, and

363 of title 11 of the Bankruptcy Code; Bankruptcy Rules 2002, 4001, and 9014; and Rule 4001-

2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois

(the "*Local Rules*"): authorizing interim and final use of cash collateral pursuant to the attached budgets (the "*Cash Collateral Motion*").

63.      To minimize the uncertainty and adverse effects on their business associated with the commencement of a chapter 11 case, the Debtors have filed the Cash Collateral Motion.  The Cash Collateral Motion seeks relief intended, among other things, to preserve the Debtors' businesses and is critical to the Debtors' efforts to preserve the value of their estates and avoid immediate and irreparable harm.

64.      The Debtors' estates will suffer immediate and irreparable harm if the Debtors do not obtain immediate access to FMB's cash collateral.  The Debtors do not have unencumbered cash and need liquidity to operate their businesses and pay operating expenses critical to the properties, including utilities, security, garbage, payroll, repairs, and maintenance.  The Debtors cannot reasonably expect their service providers to continue providing services without a source of payment while they reorganize their businesses.

65.      Without use of FMB's cash collateral as set forth in the budget attached to the Cash Collateral Motion, the Debtors will not be able to pay their direct operating expenses. Inability to use the cash collateral on an interim basis will likely result in cessation of the Debtors' ongoing operations, the loss of their tenants, and will cause irreparable harm to the Debtors' estates.   Put simply, the Debtors cannot continue operations or their restructuring efforts absent use of the cash collateral.

66.      I do not believe there will be any diminution in the value of FMB's cash collateral during the course of these Chapter 11 Cases.   Nevertheless, as adequate protection, each of Esplanade, Belvidere, and 9501 will make monthly, interest-only payments to FMB.

67.     Further, each of the Debtors will keep their respective properties insured as adequate protection against loss.

68.     Lastly, each of the Debtors shall provide FMB, to secure repayment of an amount equal to any diminution in value of FMB's cash collateral, replacement liens (the "*Adequate Protection Liens*") on the collateral described in the respective prepetition security documents. Such replacement liens shall be of the same priority as set forth in the prepetition security documents, subject only to the payment of the United States Trustee's fees, pursuant to 28 U.S.C. § 1930 and payment of all expenses in the Budget.  My counsel has informed me that, pursuant to section 361 of the Bankruptcy Code, replacement liens of this nature constitute adequate protection.

**C.     Application of the Debtors Pursuant to 11 U.S.C. §§ 327 and 328(a) for Authority to Employ and Retain Goldstein & McClintock LLLP as Counsel to the Debtors Nunc <u>Pro Tunc to October 17, 2016</u>**

69.     The Debtors are seeking to employ Goldstein & McClintock LLLP ("*G&M*") as their counsel to perform the legal services that will be necessary during the Chapter 11 Cases, effective as of the Petition Date, October 17, 2016.

70.     The Debtors submit that G&M is a disinterested party and the Debtors propose to employ G&M consistent with the provisions of section 327 of the Bankruptcy Code.

I declare under penalty of perjury that the foregoing is true and correct.

Date: October ___, 2016

By: _____

William Vander Velde III
Sole Member and Manager of each of the Debtors